## 50123. BLACKMON v. DIXON.

EVANS, Judge.

J. A. Dixon, a tobacco farmer, purchased two portable tobacco barns or drying units to be used in harvesting tobacco. No sales tax was paid on these units because of the exemption under the Sales and Use Tax Act, as amended (Code Ann. § 92-3403a C (2) (v)), as Dixon certified same was to be used exclusively in the harvesting of tobacco.

The Revenue Commissioner issued a tax assessment against Dixon, who appealed same to the superior court. The matter was tried before the court without a jury based on a stipulation and evidence. The court sustained the taxpayer's appeal, and dismissed the assessment. The commissioner appeals. *Held:*

1. The sole question here is whether these tobacco barns were for use in *harvesting* the tobacco crop, or whether there was an additional use in that they were also used to *cure* the tobacco crop. Or, to put it another way, does the *harvesting* of a tobacco crop include *curing* the tobacco; or may these two processes be separated and divided into two separate operations?

The statute (Code Ann. § 92-3403a C (2) (v)) makes it quite clear that: ". . . equipment used exclusively in harvesting . . . crops," is not subject to the tax, where such crops are to be sold as farm products. Therefore, if the Commissioner of Revenue is correct in his contention that *curing* tobacco is outside of, and not included within the term of *harvesting* tobacco, he is entitled to prevail in this case; but if *curing* the tobacco crop is an essential ingredient of *harvesting* the tobacco crop; if the tobacco

crop cannot be said to have been harvested unless it is also cured, then the taxpayer is entitled to prevail.

2. In deciding the meaning of the term "harvesting" this court is not required to consult with experts as to what that word means; this is not a word of art, but is a word with a common meaning and is as old as the English language. The statute provides that the ordinary signification shall be given to all such words. See Code § 102-102 (1).

3. The evidence discloses that before the introduction of the portable tobacco barn, the same problem existed, in that the green tobacco leaf, after being picked, had to be dried, as otherwise the moisture in the plant would cause spoilage in a very short time. Under the old method, the green tobacco leaves were laid on stringers or sticks, *in a barn,* and the moisture was allowed to evaporate. The new system created by the portable tobacco barn dried the water out of the tobacco in about the same time as the old system, there not being more than six or eight hours difference (Tr. 11). The time required in curing of tobacco (allowing it to dry) is about five or six days (Tr. 14). *When the tobacco is picked from the stalk, it has to be stored somewhere; if it is left on the ground it would ruin; it would mold; it would deteriorate and go bad; in just a few hours it would be damaged or destroyed.* (Tr. 16).

In this respect, tobacco is more susceptible to quick spoilage than most other agricultural products that ripen in the field; and it must be immediately conveyed to a storage place for drying or curing. Harvesting is one continuous operation involving the picking of the leaves from the larger plant; followed by the placing or hanging of the stripped leaves in a storage place for drying or curing. No delay may be encountered, for to delay is fatal. The green tobacco is not the finished product, but the dried or cured tobacco is the product and is then, and only then, usable as tobacco.

4. The foregoing leaves it beyond peradventure that the tobacco crop cannot be harvested unless the tobacco leaves are plucked from the tobacco plant *and cured.* Both under the old system and the new, the plucked leaves had to be placed in storage so the moisture could leave the

green plant; otherwise molding and spoilage would set in within a very few hours. No tobacco farmer could honestly state that he had *harvested* his tobacco crop if he left the freshly plucked leaves on the ground, or outside a storage house, and did nothing to aid the withdrawal of the moisture from the green leaves. The plucking of the leaves and storing them and curing them (all of which must be done in short order) is essentially one and the same, and it requires each element to constitute "harvesting" the tobacco crop.

5. Both plaintiff and defendant cite definitions from dictionaries as to the meaning of the word "harvest" which show that it is "to gather *in* a crop." Even without the use of the preposition "in," the *gathering of a crop* implies getting it together in a place where it may be used. To gather molded and spoiled leaves of tobacco and leave them in a completely unusable state could never fit the term of "harvesting a crop of tobacco." But the lexicographer went further and says harvest means "to *gather in* a crop." This can only mean to gather *in a building or other safe place* as a useful product. Funk & Wagnalls, a highly respected dictionary, seemingly lays the entire question to rest with the following definition of "harvest": "To gather *and store in a place of safety.*" Note that the product must not only be *stored,* but must be stored in a *place of safety,* suggesting safety against spoilage, as well as against theft and other hazards.

6. Neither the commissioner nor the taxpayer has cited any case directly in point. The judgment of the lower court in favor of the taxpayer is affirmed.

*Judgment affirmed. Deen, P. J., and Stolz, J., concur.*

ARGUED JANUARY 14, 1975 — DECIDED FEBRUARY 13, 1975 — REHEARING DENIED MARCH 6, 1975 —

*Arthur K. Bolton, Attorney General, Robert S. Stubbs, II, Executive Assistant Attorney General, Richard L. Chambers, H. Perry Michael, Gary B. Andrews, Assistant Attorneys General,* for appellant.

*W. P. Strickland, Jr.,* for appellee.